## WELCH, Appellant, v. MORRIS and HELEN MANN.

Division One, February 22, 1906.

1. **FRAUDULENT CONVEYANCE: Gift to Wife.** A gratuitous conveyance of a modest portion of his property to his wife by a prosperous and solvent merchant, at a time when all debts had been extinguished, in the absence of a later insolvency flowing from causes then operative, cannot be held to be a contrivance to withdraw from the hazard of a contemplated and pending business venture the property so conveyed, and hence is not fraudulent as to his subsequent creditors.

2. ———: **Homestead.** Creditors are not concerned in the disposition of a homestead. But whether or not a conveyance by a husband of a homestead to his wife, as a gift, at a time when there were no creditors, will afterwards, when abandoned as such by both husband and wife, and their marital relations dissolved by divorce, be vulnerable to attack by his subsequent creditors, is discussed in the opinion in this case, but not decided, since the point is not discussed by counsel nor presented in briefs.

3. ———: **In Consideration of Marriage.** A timely conveyance of real estate to a wife in pursuance to an oral antenuptial contract by the husband to convey property to her if she would marry him, in the absence of actual fraud participated in by her, is invulnerable to attack by his subsequent creditors, although the contract was obnoxious to the Statute of Frauds in not being in writing and in not designating the specific property to be conveyed.

4. ———: ———: **Family Settlements.** Voluntary family settlements made by those not indebted are by the law favored more than any other species of conveyance, and are safe against subsequent creditors, unless made with a present fraudulent intent, participated in by both donor and donee, that the donor is to become indebted, and to hinder and delay the collection of such future debts.

5. ———: **Contingent Indebtedness: Date.** A contingent indebtedness by which under a written contract one person, in consideration of the transfer of certain assets to him, assumes the liabilities of the transferer, must be referred back to the date of the contract, and from that date the transferee, in contemplation of law, becomes a technical and contingent debtor of the transferer.

6. ———: **Fraudulent Intent.** To overthrow a voluntary conveyance by a husband to his wife, at the suit of the husband's creditor, it must be shown that the conveyance was afflicted with fraud in fact or in intent; that is, that it was conceived and executed for a fraudulent purpose, or that it had the effect of perpetrating a fraud upon his creditors.

7. ———: ———: **Suspicion: Testimony of Husband: Desertion and Divorce.** Where the evidence creating a suspicion of the husband's fraudulent intent to hinder and delay creditors by conveying certain property to his wife arises from the husband's testimony, the court will not close its eyes to the fact that since the conveyance was made he has deserted his wife and she has been divorced from him.

8. ———: **Fraud in Fact: Indebtedness.** In a suit to set aside a voluntary conveyance of real estate to the wife by the husband as having been made by him to defraud and delay his creditors, the mere fact of a present indebtedness does not conclusively establish fraud in fact. The extent of his debt-paying ability remains to be considered, and the extent of the present indebtedness is a factor.

9. ———: ———: ———: **Property Left.** A person may, although indebted at the time, settle some portion of his property, provided enough is left to satisfy his debts. And where a husband conveyed $5,000 worth of real estate, as a settlement or gift, to his wife, at a time when his contingent indebtedness was $1,500, but had $7,500 in real estate and personal property left to meet it, the conveyance was not fraudulent in fact.

10. ———: **Suit by Purchaser at Sheriff's Sale: Better Course.** A person who buys at the sheriff's sale under a judgment in favor of a creditor against one who has voluntarily conveyed the property to another, may thereafter maintain suit to set aside the conveyance as having been made in fraud of the right of the grantor's creditors. But the modern practice, and the more equitable course, is, after judgment and before execution, to bring a suit to set aside the voluntary conveyance, for otherwise the property may be sacrificed, and that will be a fact appealing to the conscience of the chancellor when suit is brought by an execution purchaser, who stands in the shoes of the judgment creditor, to have the conveyance set aside.

Appeal from Jackson Circuit Court.—*Hon. J. H. Slover,* Judge.

AFFIRMED.

193 Sup—20

*Scarritt, Griffith & Jones* for appellant.

(1)    The conveyance by Mann to his wife, January 27, 1896, of the north half of lot 20, Phillips' Place, and lots 1 to 4, block 2, Mt. Evanston, was admittedly voluntary, and without consideration, and was void as to existing creditors.  Pawly v. Vogel, 42 Mo. 301; Bank v. Overall, 16 Mo. App. 515, 90 Mo. 410; Loehr v. Murphy, 45 Mo. App. 524; Payne v. Stanton, 59 Mo. 158; Hurley v. Taylor, 78 Mo. 238; Fisher v. Lewis, 69 Mo. 629; Shanklin v. McCracken, 151 Mo. 597; Lander v. Ziehr, 150 Mo. 412; Swinford v. Teegarden, 159 Mo. 653; Balz v. Nelson, 171 Mo. 682.  The general rule of law is that voluntary conveyances or disposition of property without consideration are without effect and fraudulent as to existing creditors.  Gardner v. Kleinke, 46 N. J. Eq. 90; Jackson v. Lewis, 34 S. C. 1; Emerson v. Bemis, 69 Ill. 540; Hanson v. Buckner, 4 Dana (Ky.) 251; Crawford v. Kirksey, 55 Ala. 282.   (2)    There is no showing made by this record that Mann was possessed of such ample means that he could convey all of his unincumbered real estate to his wife, ten or eleven months after executing the obligation to Fish, dated March 1, 1895, and after he had been pressed to discharge that obligation, and while an existing indebtedness arising out of that obligation to Fish hung over him, without violating the well-established rules respecting fraudulent conveyances.  Walsh v. Ketchum, 84 Mo. 427; Patten v. Casey, 57 Mo. 118.  The solvency required by an unbroken line of decisions in this State, essential to protect a voluntary gift, "consists not only in the present ability of the debtor to pay his debts but in such a condition of his means that payment can be enforced by process of law."  Eddy v. Baldwin, 32 Mo. 369; State ex rel. v. Koontz, 83 Mo. 323; Grocer Co. v. Walker, 69 Mo. App. 556; Hoffman v. Nolte, 127 Mo. 133; Jordan v. Buschmeyer, 97 Mo. 97.   (3)    The taking of the title to lot 32, Eaton Place, by Morris

Mann, in the name of his wife, for a debt due him, and the subsequent payment of $1,500 upon the incumbrance on that lot by Morris Mann, is patently a part of a well-defined purpose on his part to hinder, delay and defeat his creditors in the collection of their debts. Almost concurrently with that transfer he incorporated his mercantile business and thereby shifted his personal liabilities to the corporation and, by failing within fifteen months thereafter, settled them at fifty-two cents on the dollar. The obligation on which the judgment was rendered, was executed within four months of the conveyance of this lot to his wife.

*Geo. L. Edwards* and *Edward D'Arcy* for respondents.

(1) Marriage constitutes the highest and most valuable of all considerations. Bank v. Read, 131 Mo. 553; Cohen v. Knox, 90 Cal. 266; Bump on Fraud. Con. (4 Ed.), sec. 266; Magniac v. Thompson, 7 Pet. 348; Frazer v. Thompson, 1 Giff. 49; Douglasse v. Ward, 1 Ch. Ca. 99. (2) And when the wife takes a conveyance in consideration of marriage in good faith, the conveyance is valid, though the husband intended to defraud his creditors. Bank v. Read, 131 Mo. 553; Magniac v. Thompson, 7 Pet. 348; Partridge v. Gopp, 1 Eden 163; Campion v. Cotton, 17 Ves. 264; Andrews v. Jones, 10 Ala. 400; Eppes v. Randolph, 2 Cal. 103; Jones' Appeal, 62 Pa. 324; Otis v. Spencer, 102 Ill. 622; Bump. Fraud. Con. (4 Ed.), secs. 266 and 272; Nance v. Nance, 84 Ala. 375. (3) It has always been held in Missouri and everywhere else, that no contract which has been fully performed is within the Statute of Frauds. Smith v. Davis, 90 Mo. App. 533; Maupin v. Railroad, 171 Mo. 187; See v. Malone, 82 S. W. 557; Graff v. Foster, 67 Mo. 512; Blanton v. Knox, 3 Mo. 342; Mueller v. Wiebracht, 47 Mo. 468; Taylor v. Penquite, 35 Mo. App. 389. (4) The proof by a subsequent creditor, of prior debts of the grantor, must be

specific, and this proof must also be accompanied by evidence of the grantor's inability to pay those debts. Bump, Fraud. Con. (4 Ed.), sec. 296; Smith v. Greer, 3 Humph. 118; White v. Sansom, 3 Atl. 410; Loeschigk v. Hatfield, 51 N. Y. 660; Wilbur v. Fradenburgh, 52 Barb. 474; Hutchinson v. Kelly, 1 Rob. 123; Bank v. Patton, 1 Rob. 494. (5) Voluntary conveyances are void only so far as may be necessary to satisfy prior creditors, and if they are paid, the conveyance will stand. Bump, Fraud. Con. (4 Ed.), sec. 296; Ingram v. Phillips, 3 Strohb. Ch. 565; O'Connor v. Bernard, 2 Jones 654; Lyne v. Bank, 5 J. J. Marsh 545; Sweney v. Ferguson, 2 Blackf. 129; Freeman v. Burnham, 36 Conn. 469. (6) So far as subsequent creditors are concerned, a voluntary conveyance, to be set aside, must have been made with an intent to put the property out of reach of debts which the grantor at the time has contracted, or intends to contract, and which he does not intend to pay, or has reasonable grounds to believe he may not be able to pay. Bump, Fraud. Con. (4 Ed.), sec. 292; Winchester v. Charter, 94 Mass. 606. (7) The burden of proof is upon a subsequent creditor, to show an actual intent on the part of the grantor to defraud his creditors. In this respect the rights of a subsequent creditor differ from those of an existing creditor. Bump, Fraud. Con. (4 Ed.), secs. 291 and 295; Loeschigk v. Hatfield, 51 N. Y. 660; Nicholas v. Ward, 1 Head 323; Hagerman v. Buchanan, 45 N. J. Eq. 292; Hussey v. Castle, 41 Cal. 239.

LAMM, J.—Helen Mann, born Miles, married Morris Mann on September 27, 1893, and is in possession of certain parcels of real estate in Kansas City, claiming title under two deeds of conveyance. The grantor in one of these deeds, her brother, Oscar L. Miles, by a conveyance dated September 24, 1894, duly of record, conveyed to her lot 32 in Eaton Place, an addition to Kansas City, Missouri, for an expressed consideration

of $7,500, subject, however, to two incumbrances, one, $4,500, the other, a junior lien, $750. The grantor in the other deed is her husband. His deed, dated January 27, 1896, for an expressed consideration of $5,000, conveys to her lots 1, 2, 3 and 4 in block 3 in Mt. Evanston, and the north half of lot 20 in Phillips' Place—said Mt. Evanston and Phillips' Place being additions to said city—and which conveyance was duly recorded. One other tract of ten acres, north of Independence, bearing a diffuse description, and referred to herein as tract "A" for convenience, also passed by this latter deed to Helen Mann.

The consideration paid for the Eaton Place tract was the present release of an indebtedness of $1,500 due from Oscar L. Miles to Morris Mann. No cash consideration passed between Mrs. Mann and her husband on the second conveyance.

One Fish, on the 23d day of March, 1899, commenced a proceeding against Morris Mann in the circuit court of Jackson county, Missouri, to recover on sundry items of alleged indebtedness, $2,044.90, alleged to have accrued at divers dates between October, 1895, and March or May, 1896, and which proceeding ripened into a judgment in favor of Fish on July 3, 1902, in the sum of $1,500. On that same day an execution issued and was levied on the aforesaid parcels of real estate standing in the name of Helen Mann—including tract "A." After due advertisement, all said tracts except "A," were sold to John S. Welch, appellant, on September 6, 1902, at sheriff's sale, he bidding and paying for the Phillips' Place tract, $300; for the Eaton Place tract, $150; and for the Mt. Evanston tract, $200. On the 22d day of the same month Welch received a sheriff's deed therefor, properly acknowledged and recorded—tract "A," passing off to one Christian Doerr, a stranger, is not directly affected by the present litigation.

Welch was not a creditor of Mann. A resident of

Kansas City, he bought at the sheriff's vendue, without seeing the parcels of real estate struck off to him or the improvements appurtenant thereto, without having the title examined, and without understanding or attempting to understand the condition of the title. He was moved to his "sight-unseen" (or, as some juvenile authorities put it, "unsight-unseen") purchase by being assured there was a bargain, and as a speculative venture (*i. e.*, he, in the graphic idiom of the street, preserved in the record, "took a 'flyer'") after consulting with Fish's attorneys. Including the Doerr bid for tract "A," $600, the net proceeds of the sale, $1,037.70, were credited on the Fish execution.

On the day following the acknowledgment and recording of his sheriff's deed, Welch lodged in the same court his bill in equity against Morris Mann and Helen Mann, the object and general nature of which was to establish his own title to said real estate, divest the record title of Helen Mann out of her, and vest the same in himself, to have an accounting of rents and profits, to appoint a receiver, to have an injunction against waste and to obtain possession. The bill proceeds on the theory that Morris Mann was insolvent when the several conveyances to his wife were executed; that among his creditors was the said Fish; that Morris Mann, in spite of said conveyances to his wife, remained the beneficial owner of said real estate; that the sheriff's deed conveyed his title to plaintiff, and that the conveyances to Helen Mann were a part of a fraudulent scheme to hinder and delay Mann's creditors and cheat and defraud them, especially said Fish; that Helen Mann colluded with her husband in said scheme of fraud, and that the conveyances to her were voluntary.

To this bill Helen Mann filed a separate answer tendering the general issue, while Morris Mann defaulted, employed no attorneys and took no part in the trial below as a litigant, nor here on appeal.

Late in 1901 or early in January, 1902, Morris and

Helen Mann ceased to live together as husband and wife. From 1898 down to September, 1901, their marital relations were strained because of his absenting himself from her at periodic times, and which periodic absences culminated in a final desertion in January, 1902. An infant daughter is the sole product of their union, and for a few months after such desertion the husband provided for his wife and child and then quit. She brought no property into their joint marital venture, and she and her child are without provision except the parcels of land in controversy and the usufruct thereof. Prior, we think, to the date of the sheriff's deed relied upon by appellant, and possibly prior also to the date of the judgment in Fish v. Mann, the deserted wife procured a divorce, awarding her the custody of her child. Up to the time her husband stepped down and out from his place as the head of his family and cast off the burden of its maintenance, he seems by her tacit consent or acquiescence to have collected such rents as accrued on the several properties conveyed to her, and paid the taxes. On a date, approximately fixed at his failure to provide for her and her daughter, she assumed through her agents the collection of rents, the making of repairs and the payment of such general and special taxes as the income would permit. It is, furthermore, shown that the Eaton Place property was the home of the Mann family from the time of its purchase down to an uncertain date, possibly in 1896. It is disclosed, also, that the present amount of the incumbrance on it is $3,000; and that within three months after its conveyance to his wife on September 24, 1894, and before Christmas of that year, the incumbrance existing at the time of its purchase was reduced by the payment of $1,500 by Mann. What became of the second mortgage of $750, which should also have been paid off in order to leave the existing incumbrance $3,000, as above, does not appear.

The court below found generally for the defendant,

Helen Mann, dismissing plaintiff's bill, from which finding and judgment plaintiff prosecutes his appeal.

The issues presented here group themselves logically under the following propositions: It is affirmed on one side and denied on the other that Mann was insolvent at the time of the conveyances to his wife, and that the said conveyances were a part of a fraudulent scheme to hinder and defraud his creditors. And it is affirmed on the one side and denied on the other that the deeds to Helen Mann were made in pursuance of an oral antenuptial agreement, having marriage as a consideration, and that such antenuptial oral contract, if existing, consummated by conveyance after marriage, would be effective as against creditors, prior or subsequent.

As this is an equity case to be considered *de novo*, by us, and, under the rule that we should defer somewhat to the superior position of the chancellor, *nisi*, in weighing oral testimony, it will not be essential to waste time upon mere questions of admissibility of evidence suggested by counsel, pro and con, because the evidence itself is here—the irrelevant, we can discard; the relevant, we can consider.

From the above free outline of the case and the foregoing general issues presented for consideration, such a line of cleavage in fact, and possibly in the law applicable to the facts, between the two conveyances under which the wife claims, suggests itself as to point to the wisdom of a separate consideration of the Eaton Place property.

I. Attending, then, to the conveyance from Miles to his sister, Mrs. Mann, the consideration for which, $1,500, moved from Mann to Miles—the existing incumbrances being reduced by Mann's payment of an additional $1,500 before yuletide of the same year, 1894— should that conveyance be set aside and the record title of Mrs. Mann be vested out of her and into Welch, the purchaser at the sheriff's sale under the Fish judg-

ment? We think not. And this for the following reasons:

(1)  In the first place, a closer presentation of the facts pertaining to Mann's insolvency will appear presently in the consideration of the second conveyance to Mrs. Mann. It will suffice for present purposes to say that on September 24, 1894, Mann was apparently a prosperous and solvent wholesale and retail confectioner in Kansas City; and that at that time he had entered into no contractual relations with Fish nor is there any hint he contemplated any such relations. On the one hand, it is inferable from the evidence that each and every of his then existing current debts was extinguished. As one hand washes the other, so these hypotheses must be held to neutralize each other. No creditor then existing complains, or has cause to complain, of this conveyance. Nor is there anything in the record to show that it was made to put to one side for a rainy day, *i. e.,* out of jeopardy from a business enterprise in contemplation which might prove hazardous, any portion of Mann's property.

The only suggestion made to us, said to point that way, is that, presently thereafter, Mann incorporated his candy business and that candy business, so incorporated, wrecked itself in the rise of a year, as will hereinafter appear. But we may not allow to this afterfact the significance desired by appellant; forasmuch as he has not carried, at least, one burden imposed upon him by the law, and that burden was to show in the absence of existing debts and insolvency, or later insolvency following from causes then operative, that this transfer to Mrs. Mann, with his subsequent payment on the incumbrances, was a contrivance to withdraw from the hazard of a contemplated and impending business venture the property in question; since, otherwise, a conveyance to his wife in the form of a gift of a modest portion of his property is not in the teeth or under the ban of any legal principles within our ken.

That one must be just before being generous is not only a chip off of a sound block of chimney-corner philosophy, but axiomatic in the law. However, it must also be remembered that when justice to creditors does not dam the waters of marital generosity, they may flow on in due channels, not a whit ruffled or impeded.

(2) In the second place, in a city of 40,000 inhabitants or over, and we take judicial notice of the fact that Kansas City comes within that class, a homestead, exempt from execution or attachment, is allowed of the value of $3,000. [R. S. 1899, sec. 3616; R. S. 1889, sec. 5435.] The value of the Eaton Place property, put at $5,000 at the time of trial, was put at the same figure in 1896. There is nothing from which we can conclude that at the time of the purchase of the equity in September, 1894, that equity was worth more than the $1,500 actually paid. So that, the property was susceptible of becoming a homestead and remaining a homestead even after the subsequent payment of $1,500 on the incumbrances. It goes without saying that such homestead might be abandoned and thereby become subject to execution levy and sale. It will be seen from the facts heretofore uncovered that Mann and his family resided at 32 Eaton Place at the time of its purchase and thereafter for an undetermined time. Now, the testimony is obscure on the question of abandonment, as we read the record. In fact, no testimony was directed expressly to that point, though an abandonment is strongly to be inferred, nor is the homestead law in anywise invoked here as a protection for Mrs. Mann. She was living in St. Louis at the time this case was tried and had been for some time. Mann also resided there, having come from Duluth, and she procured her divorce in St. Louis. The question of homestead is introduced by us for a purpose soon to be seen. Thus: if it be conceded to appellant that Mann remained the beneficial owner of lot 32 Eaton Place, and if it be further assumed, merely *arguendo,* that it had never been

abandoned as a homestead, then such property would not be the subject-matter of fraudulent disposition; for creditors are not concerned in the disposition of the homestead. [Balz v. Nelson, 171 Mo. 682; Stam v. Smith, 183 Mo. 464.] If, on the other hand (and this hypothesis is more to the point), no persons exist who were creditors of Mann in 1894, and who, armed with process, are pursuing their claims, and if Mann procured the conveyance to his wife of property that then became a homestead, exempt at the time from execution levy and sale by his subsequent creditors, why may not such conveyance to his wife remain invulnerable to assault from such creditors, or those standing in their shoes like Welch, although it afterward lost its character as a homestead by abandoment? In other words, may a conveyance of a homestead to a wife, not fraudulent at the time made, become fraudulent *in futuro?* As this point was not discussed by counsel nor presented in briefs it would be unprofitable to pursue the inquiry, and we leave the matter with an expression of doubt on that proposition, and with the further suggestion that if a conveyance be fraudulent in law or fact, it would seem it needs must be so because of its relation, *in praesenti,* to other then existing facts. If innocent at the time made and if title then vested in the wife, is it consonant with wholesome reasoning to assert that by some legal necromancy presto! change! its birthright innocence is transformed into a sinister contrivance by proof of after-happenings?

(3) In the third place, there is proof that during Mann's courtship he offered to convey property to Helen Miles if she would marry him. There is evidence tending to show that this offer was accepted and a marriage contract, based on that consideration, made and consummated. Such antenuptial contract, so looking to a settlement upon his wife to-be, is not in writing, is indefinite and without legal precision—no date is

fixed for performance, no specific property is described, and it is proved alone by the testimony of respondent, somewhat lacking in fullness. It may be said of this infirm contract that its specific performance could not have been enforced in court; that it was not only obnoxious to the Statute of Frauds, but was too indefinite and uncertain for enforced specific performance. The question of its enforced specific performance, however, is mere burnt powder and not in the case; because, here there was a domestic and voluntary specific performance—here the consummation of the contract is a *fait accompli.* Nor is a contract fully performed within the Statute of Frauds. [Maupin v. Railroad, 171 Mo. l. c. 197; Graff v. Foster, 67 Mo. 512; Bank v. Read, 131 Mo. *infra.*)

In the absence of actual fraud participated in by the wife, which is the case at bar, the present inquiry, it seems to us, may seek alone the consideration: Is marriage a sufficient, a valuable consideration? The question is not new. Marriage is a sufficient consideration to support a conveyance. Such is the doctrine of this court (Bank v. Read, 131 Mo. 553) and elsewhere (Cohen v. Knox, 90 Cal. 266); and is the general rule (Bump on Fraud. Conv., 4 Ed. sec. 266). In the Cohen case it is said: "Marriage being in its nature permanent, and being the most important of all civil relations, the law will not lightly allow the inducements which have led up to it to be disturbed." And, again: "Marriage is the highest and most valuable of considerations; and when a conveyance is made upon such consideration, the grantee, if guiltless of fraud herself, is in at least as firm and sure a position as if she had paid in money the full value of the property conveyed."

It would not seem pertinent to the conveyance now under consideration to say whether or not the indefinite, parol contract shown in this case, if allowed to remain in abeyance for several years by the wife and to be

consummated a long time after marriage, and after the rights of creditors had intervened, would be tolerated by the law; because, the conveyance in question was made three days less than a year after marriage; and, as said, the rights of no creditors had intervened either at the date of the deed or at the time of the subsequent payment of $1,500 on outstanding incumbrances.

It may be said that voluntary family settlements made by those not indebted are by the law favored more than any other species of conveyance, and are safe against subsequent creditors, unless made with a present fraudulent intent, participated in by both donor and donee, that the donor is to become indebted, and to hinder and delay the collection of such future debts.

In our opinion the conveyance of lot 32 Eaton Place by Miles to Mrs. Mann ought to be sustained upon the reasoning advanced in this paragraph, as well as in the first paragraph of this subdivision of the opinion. And, accordingly, the holding of the chancellor, *nisi*, is now sustained *pro tanto*.

II.   We now approach the close question in the case, and that is, whether the conveyance by Mann to his wife on January 27, 1896, is impregnable to an attack from one standing in the shoes of Fish?—*i. e.*, should the finding below be sustained *in toto?*  This question must be considered in the light of the foregoing general proposition that the law favors family settlements when not counter to business morals.   We think, too, the following facts are established in this case, viz: (1) If Mann had a fraudulent design in making this conveyance, his wife did not participate therein.  She knew nothing of his personal insolvency or personal debts, if either existed.   And (2) the conveyance was without consideration unless it be referred to the parol antenuptial agreement heretofore commented upon.

Keeping the foregoing in mind, as well as the

other facts hereinbefore uncovered, it will be necessary at this point to state more fully some additional record facts.

It seems that prior to the 1st day of March, 1895, Fish, a lawyer and resident of South Bend, Indiana, was a subscriber to an underwriting insurance scheme in New York, whereby he and an aggregation of fellow-subscribers became severally bound to pay, *pro rata,* certain contingent losses on certain insurance policies theretofore underwritten by said subscribers under the style of Indemnity Fire Lloyds. Policies underwritten by Fish and said aggregation were outstanding and other underwritings contemplated. Profits also stood on the books of said Lloyds to the credit of Fish, who being moved to withdraw from said scheme, on the 1st day of March, 1895, induced Mann to take his place, who, pursuant thereto, on said day executed the following instrument to Fish:

"Whereas, Frederick S. Fish, a subscriber to Indemnity Lloyds, has this day transferred to me by written assignment all of his rights and interests as a subscriber and underwriter at the Indemnity, transferring to me all his interests in any profits that may arise upon any and all business underwritten in his name at said Lloyds.

"Now, therefore, in consideration of such assignment, I do hereby agree to assume and discharge all of his liabilities upon and under any and all policies heretofore underwritten in the name of the said Frederick S. Fish at said Lloyds, and to hold him harmless therefor.

"In witness whereof, I have hereunto set my hand and seal this 1st day of March, 1895.

"MORRIS MANN. (Seal.)

"Witness: C. B. Gee."

Thereafter losses occurred on such outstanding policies during November and December, 1895, and dur-

ing January, March, April and May, 1896, and de-
mands were made on Fish by Indemnity Fire Lloyds
to pay his *pro rata* assessment thereof.   Fish put the
matter to Mann by letter to which he paid no attention.
Fish thereafter liquidated his liability and also paid a
certain sum for a full release of all his contingent lia-
bility, and instituted suit on Mann's said bond of in-
demnity in the circuit court of Kansas City, Missouri,
on the 23d day of March, 1899, to recover said items of
loss, amounting, as he contended, to $2,044.90, which
suit, as said heretofore, ripened into a judgment in his
favor on July 3, 1902, in the sum of $1,500.

Going back a little in Mann's affairs, it seems that
prior to September 29, 1894, he was in business in
Kansas City, as a wholesale and retail confectioner as
partner in a firm of Manning & Mann.   Subsequently,
about May, 1894, he purchased Manning's interest and
continued the business under the style of Morris Mann
until September 29, 1894.   His confection business is
shown to have been the best in Kansas City, save one,
as a retailer, and possibly the very best as a wholesaler.
His business reputation was excellent and, as presently
to be seen, he was possessed of property and means to
a considerable extent outside of his confection business.
On September 29, 1894, he incorporated his said busi-
ness under the style of Mann & Miles Manufacturing
Company, authorized by its charter to do the business of
manufacturing candies, crackers, cakes and extracts, and
to engage in the wholesale and retail of cigars, candies,
confections and extracts.   The Mann & Miles Manu-
facturing Company was capitalized at $10,000, divided
into one hundred shares of stock of the par value of
$100 each, of which Mann owned ninety-seven shares,
paid for by turning over to the corporation his assets
as a confectioner and the good will of the business—
then considerable—the corporation assuming his cur-
rent business debts.   The record is in a condition mak-

ing it impossible to state the amount of these current business debts, but, we think, there is evidence upon which the chancellor could well base a finding that Mann's business as a confectioner at that time was in a healthy condition and that no fraud was perpetrated or intended by incorporating it; that Mann's stock in the corporation was worth par; and that the corporation, considering its assets, as well as liabilities assumed, was not overcapitalized and had a fair start in life. In one year, one month and sixteen days, to-wit, on November 15, 1895, this corporation went to the wall and made an assignment for the benefit of its creditors—its stock becoming waste paper. The claims allowed under the assignment were $10,273.89. The assets realized were $7,229.26. The dividend paid creditors was fifty-two cents on the dollar. It is insisted by appellant that the seeds of this disaster were planted prior to the birth of the corporation; that the corporation was not wrecked by the vicissitudes of its own business, but by the assumption of Mann's individual debts—a vice said to be inherent in the scheme. It is insisted by respondent that a war in prices broke out between the Mann & Miles Manufacturing Company and other dealers of Kansas City, including a candy trust, and that the result of such *razzia* was ruin to Mann's enterprise. Evidence was introduced tending to prove both appellant's and respondent's insistences.

Coming on down to January 27, 1896, the date of Mann's deed to his wife, and attending to his personal debts then existing, the evidence is exceedingly dim and unsatisfactory. As we gather it, however, at that immediate time the only individual debt Mann owed, outside of the Fish obligation, was to the Bank of Commerce of Kansas City, $1,500, secured by Mann's stock in a pie corporation known as the Ingram Pie Company, or the Homemade Pie Company. We do not understand (or hold) that said corporation made all the pies

eaten in that great and hungry city, but we do under-
stand from the evidence (and would be inclined to so hold,
if necessary) that it had a monopoly in the making and
selling of that sad and indigestible commodity known
as commercial (as distinguished from political), pie—a
commodity abounding in the marts of that town it is
said and trafficked in for gain—a pie made of the Ben
Davis apple (this is pure hypothesis and hence, *obiter*),
split, dried and subjected to other forms of mysterious
and unpalatable manipulation.    In this pie concern
Mann owned twenty-one or twenty-five shares of the par
value of $100 per share, worth on the market dollar for
dollar—witness thereto the testimony of one Pfeifer
who, under the inspiration and sanction of his oath was
allowed to adjudge its corporate solvency in the follow-
ing formula: ''The pie end of Mann's business never
busted.'' If Mann owed individual debts other than
those enumerated, the fact is not so well established by
the proof as to be the predicate of a finding by the chan-
cellor.

It will be unnecessary to go into the details of
Mann's individual assets, but it may be said that at the
time of his conveyance to his wife he owned other real
estate, unaffected by the conveyance, of the value of
$1,520, some of it located near Wichita, Kansas, and
some in Kansas City, and available personal assets in
paper secured on real estate, in said pie stock and in
other forms of assets, in the amount of $8,000.    Re-
spondent tabulates these assets and sums them up as
above. Appellant's learned counsel somewhat concedes
the tabulation and estimate, while doubting its efficacy,
by the following remarks in their brief: ''A cursory
examination of the table of assets found on page 5 of
the brief of counsel for respondent clearly shows that
Mr. Mann did not retain under the conveyance to his
wife of January 26, 1896, ample means with which to

meet his existing debts as required by law and fair dealing in order to validate a voluntary conveyance to his wife." It may further be said that in the tabulation of assets by respondent's counsel there is an item of Arizona mining stock put in at $1,000, which, in our opinion, should be much pared down. It may be said on the other hand that there were some odds and ends belonging to Mann, akin to chips and whetstones, yet of some appreciable value, which are not included in the foregoing tabulation of assets. Take it by-and-large, we should say that Mann's individual personal assets would be more fairly stated at, say, $7,500. But as this included the Ingram pie stock which was hypothecated for $1,500, the latter sum should be deducted from the foregoing assets, leaving, say, $6,000. If we add to this the value of the real estate retained by him, there would be left assets to the amount of $7,500 to respond to the Fish obligation, adjudged to be $1,500.

The value of the parcels of real estate conveyed to Mrs. Mann by her husband's deed of January 27, 1896, arrived at partly by the evidence and partly by concession and inference, may be placed as follows: Mt. Evanston property, $1,500; Phillip's Place property, $1,000 to $1,500; tract "A," $2,500. It is but just to say the estimate of tract "A" is taken from respondent's brief. We find no evidence directed to its value. It is but just to say further that appellant's counsel insist that the above estimate, which coincides with the consideration placed in Mann's deed to his wife, is much too great, but appellant does not put his finger on specific evidence bearing out that contention, and we have been unable to find it, though Mann, as a witness, intimates that the values going to make up the $5,000 consideration were somewhat sentimental. He does not qualify as an expert on values and our chief reliance, outside of the value placed on tract "A," is upon the evidence of a Mr. Shryock, who impresses us as a fair

and competent witness. As to tract "A," it may be said that it sold at a sheriff's sale for $600 under the same conditions that the Eaton Place tract sold for $150, the Mt. Evanston tracts for $200, and the Phillip's Place tract for $300. Taking into consideration the proof as to the actual value of these latter tracts, the bid on tract "A," so far as significant at all, would indicate a proportionate actual value in the neighborhood of $2,000 or $2,500. In the absence of a more satisfactory basis, we may be permitted to arrive at a value by seizing on the best means presented to us in the record.

Assuming, then, that the value of the real estate conveyed to Mrs. Mann was either $5,000, or approximately that; assuming, too, that Mann retained in hand at that time $7,500 in real estate and personal property; and also assuming that Fish was his creditor in the sum of $1,500 at the time he made the conveyance in question, ought the conveyance to stand? We think so, because:

(1) Within the purview of laws leveled against fraudulent conveyances, Fish must be held a creditor from the date of Mann's contract of indemnity, March 1, 1895—at least a technical and contingent creditor within such purview. The contingent indebtedness contemplated by that contract, when the liability matured, must be referred back to the date of the contract itself. [Frees v. Baker, 81 Tex. 216; Ridler v. Ridler, 22 Law Rep. (Ch. D.) 74; Van Wyck v. Seward, 18 Wend. 375; Howe v. Ward, 4 Me. 195; Bump on Fraud. Conv. (4 Ed.), sec. 506; Johnson v. Murphy, 180 Mo. l. c. 613, et seq.]

But conceding that Fish was a creditor, and that appellant as a purchaser under Fish's judgment may invoke the aid of that fact, yet such concession does not settle this case, and this is so for the reason that a conveyance, before being overthrown at the suit of a creditor, must be afflicted by the infirmity of fraud in

fact or in intent; and before a voluntary settlement up-
on a wife may be avoided by such creditor, it must be
shown that it was conceived and executed for a fraudu-
lent purpose, or that it had the effect of perpetrating a
fraud. In this case we find evidence upon which a sus-
picion of fraudulent intent on Mann's part might be
based, but evidently it was not satisfactory to the chan-
cellor below, nor is it to us. That the Mann & Miles Man-
ufacturing Company became insolvent and was in that
condition at the date of the deed is obvious, but Mann
was not bound individually for the debts of that concern
and its financial condition and its relation toward its
corporate creditors may not have controlling force in
this litigation; for it is *res inter alios acta.* We say
the evidence might create suspicion of a fraudulent in-
tent, and we say so because that evidence was elicited
from Mann himself by deposition. We can not close
our eyes, however, to the fact that Mann at the time he
testified was dealing at arm's length with his wife and
her affairs. He was not a friendly witness, as that term
is known to the law, and his testimony must be sifted
and weighed.

We rest content with the finding of the chancellor,
necessarily implied, that Mann's deed to his wife did
not have its origin in a fraudulent purpose.

(2) Was such deed fraudulent in fact? Did it op-
erate as a fraud upon creditors? The mere fact of a
present indebtedness is not conclusive, because the ex-
tent of his debt-paying ability remaining has to be con-
sidered in answering this question, and the extent of
said present indebtedness is a factor. The English rule
is stated by Mr. May [May on Fraud. Conv. (2 Ed.),
*50] thus: "Where, at the time when the settlement
was made, there remained property, not included in it,
ample and available for the payment of debts, and no
special circumstances of fraud, how can it be said that
any creditor was either defrauded or delayed by the

settlement? If he had at once taken steps to recover the amount due to him, the settlement would have been no obstacle to his getting his money; but if he neglects to do that, and waits until, by a reverse of circumstances, the settler becomes embarrassed, it is his own laches, and not the settlement, which has prevented him from being paid in full." And again, the same author (* 55), says: "The amount of property withdrawn by the settlement from liability to the claims of creditors must be taken into consideration; for a person may, although indebted at the time, settle some portion of his property, provided that enough is left for satisfying his debts." The same auhtor (*57) says: "In examining the position of the settler's affairs, the true test is, what is the nature and extent of his liability at the time of making the settlement? Those liabilities, whether they consist of debts actually due, or soon due or of merely remote and contingent liabilities, must be estimated as a reasonable and not sanguine man would estimate them, taking a reasonable view of what seems likely to happen. . . . The question is varied also by the nature of the debt owing; the existence, for example, of a mortgage debt is of no importance."

The American rule is stated the same way, stress being laid upon "ample means" remaining and upon such a condition of his means that payment can be enforced by process of law. [Walsh v. Ketchum, 84 Mo. l. c. 430-1; Eddy v. Baldwin, 32 Mo. 369.] A voluntary conveyance is not fraudulent *per se* as to existing creditors. [Pepper v. Carter, 11 Mo. 540.] The circumstances of each case must be considered. And see, for an elegant formulation of the principles of law governing this question, 14 Am. and Eng. Ency. Law (2 Ed.), 301, *et seq.*, cited approvingly by BRACE, J., in Johnson v. Murphy, 180 Mo. supra.

Applying the foregoing principles to the facts of this case, it will appear that Mann's debt to the Bank of

Commerce must not be taken into account, because it was secured by a collateral pledge of greater amount. It is on the same foot as a mortgage debt under the rule laid down by May. This leaves to be reckoned with his liability to Fish alone. Considering that, we are not prepared to say that a man who has reserved so much as $7,500 to answer to a liability of $1,500 may not, by a voluntary settlement upon his wife, part with $5,000 of his estate. To this complexion the case comes, and we so hold.

(3) While not necessary to this decision, and, hence, somewhat by the way, yet, in a given case, we might lay some stress upon the proposition that while a judgment creditor is within his strict legal right in enforcing his judgment by execution levy and sale against property held in the name of another, which he contends such other person is seized of to the use of his grantor —the judgment debtor—and while a purchaser at such execution sale may thereafter lodge his bill to get aside a conveyance in the road of his sheriff's title (Lionberger v. Baker, 88 Mo. 447; R. S. 1899, sec. 3171); nevertheless, as a final resort must be made to a court of conscience to clear up the title, the more gracious way is to give the conscience of the chancellor full play by going there first. The modern practice, the more equitable and, hence, the better course is, after judgment and before execution levy and sale, to bring a suit to set aside the alleged voluntary conveyance, and, if successful, then subject the property to execution process; because by the former course there would naturally result a great sacrifice of the property, for the tendency would be to restrict bidding to a class limited to the speculative few who know, or think they know, the facts or shrewdly guess the same. Because, too, such course presents to the record-owner the horns of a dilemma— one horn being that by bidding he may thereby furnish evidence tending to prove the judgment debtor the true

owner; the other horn being that if he neglects to bid, the property, which he may hold through no actual fraud on his part, may be lost to him because of a state of affairs afterwards, and for the first time, shown to exist when the title is tried. Take this case: here several thousand dollars worth of property was sold for a small sum, and while inadequacy of consideration alone may not be a ground of equitable interference, yet, coupled with other incidents, it may help to persuade a chancellor's decree.

The judgment is affirmed. All concur.