Gruner v. Scholz.

GRUNER, Appellant, v. SCHOLZ et al.

Division Two, February 20, 1900.

1. **Fraudulent Conveyances: FROM HUSBAND TO WIFE.** The courts will closely scrutinize all transactions between husband and wife to discover any fraudulent scheme to defraud his creditors, but they will not go so far as to prevent the wife from honestly securing a home for herself and her family when he has failed in business.

2. ———: ———: CASE STATED. The husband failed in business and made an assignment for benefit of creditors, reserving his homestead on which there was a mortgage of $4,200. This he afterwards sold to his brother for $800 subject to the lien, at a time when his general creditors had no claim thereon, and his brother, who had been befriended by his family, made a present to the wife of the equity of redemption, vesting the title in her, subject to the lien. Her friends and her father's friends proposed to indorse for her so she could buy a drug store, but with the understanding that the husband, an experienced pharmacist, would manage the business. This was done, she furnished $200 of her own, and she, her husband and her friends borrowed $1,000, the store was bought for $1,200, became a prosperous business, and in eighteen months the note had been paid out of the business. Then she sent her husband to a medical college for two years, and when he graduated gave him $800 for office furniture, etc., and thereafter he made about $1,500 per year, and supported the family. She inherited $2,400 from her father's estate and with this money and other money derived from the store, she built a house on the homestead lots at a cost of $3,200, rented it for $36 per month, she and her family occupying the old house on the homestead lots. *Held*, that this suit to set aside the conveyance to the wife by the brother, on the ground that it was a part of the fraudulent scheme to defraud the husband's creditors, can not prevail. *Held*, also that it was immaterial, for the purpose of this suit, whether or not her signature to the $1,000 note would bind her in law, as she thought it would and at the first refused to sign the note because she felt it would hazard her own property.

3. ———: ———: WIFE'S BUSINESS: HUSBAND AS MANAGER. The wife can employ the husband or accept of his services in running her drug store, and he can also lawfully give her his services therein to aid her in supporting the family, without subjecting the property to the claims of his creditors.

4. ———: ———: PRESUMPTION: WIFE'S MONEY. The presumption that property obtained by the wife during coverture was purchased with his money, may be rebutted, and if the transaction consists as well with honesty as with fraud, it will be presumed honest.

5. ———: ———: ———: ———: INDORSEMENT OF NOTE. The requirement by the other indorsers that the husband become a surety on the wife's note given to secure the money with which the drug store was bought, did not destroy the force of the other proof that the store was bought by and for her.

Appeal from St. Louis City Circuit Court.—*Hon. Selden P. Spencer*, Judge.

AFFIRMED.

*Kehr & Tittmann* for appellant.

(1) The presumption of law is that property acquired by the wife during coverture was paid for with the means of the husband, and the burden of proof was on the defendants to rebut the presumption by evidence, specific and in detail, to show where the money with which the purchase was made came from. Garrett v. Wagner, 125 Mo. 461; Sloan v. Terry, 78 Mo. 623; Crook v. Tull, 111 Mo. 283; White v. Clasby, 101 Mo. 162; Patton v. Bragg, 113 Mo. 595; McTerren v. Kenney, 22 Mo. App. 554. (2) The purchase of the drug store in the name of his wife was a scheme and device concocted by defendant Philip Scholz, with the consent of his wife, to make a permanent provision for his own use and that of his family, and to keep the property used in and gained by it from his creditors. Hence the drug store and all the profits and gains thereof, and all property acquired therefrom, are subject to the claim of his creditors.

Bump on Fraud. Conv. (4 Ed.), secs. 223, 224; Wadding-ham v. Loker, 44 Mo. 132; McLaren v. Mead, 48 Mo. 115; Pawley v. Vogel, 42 Mo. 299; Lachman v. Marlin, 139 Ill. 450; Hyde v. Frey, 28 Fed. Rep. 819; Onsorge v. Bath, 88 Wis. 553; Hamilton v. Zimmerman, 5 Sneed, 39; Bank v. Sprague, 20 N. J., Eq. 13; Blum v. Ross, 116 Pa. St. 163. (3) Notwithstanding the guise of a note executed by Mrs. Scholz, who had no property whatsoever at the time, the testimony shows that the consideration for the purchase of the drug store was $200, paid by him out of his means, and $1,000 realized on a note obtained by him through his friends on his own credit and his skill and ability as a druggist. McLaren v. Mead, 48 Mo. 115. (4) In any event, he was a co-maker of the note with her. The note was paid out of his means, the surplus of the fruits of his own skill, labor and vocation, after complying with his legal duty to support his family. Hence the store and the profits thereof were subject to the demands of his creditors. Bump on Fraud. Conv., *supra*; McLaren v. Mead, *supra*. (5) At the time of the purchase of the drug store Mrs. Scholz had no separate estate. Her husband could not, therefore, as against his creditors, purchase property in her own name, and on her credit, control and manage it as her agent, and pay for it by his own industry, thus investing the proceeds of his skill and labor in her own name. The law does not recog-nize credit of a married woman having no separate estate. Bump on Fraud. Conv., *supra*; Lienbach v. Templin, 105 Pa. St. 522; Blum v. Ross, 116 Pa. St. 163; Carpenter v. Mitchell, 50 Ill. 472; Dunning v. Pike, 46 Me. 463; Atkin-son v. Richardson, 74 N. C. 458; Lachmann v. Marlin, 139 Ill. 450; Wilkinson v. Cheatham, 45 Ala. 342; Ames v. Forster, 42 N. H. 381; Whitworth v. Carter, 43 Miss. 72; Robinson v. Trustee, 11 Bush 179; Jones v. Crosthwaite, 17 Ia. 402. (6) But even if, by any inference, it could be

claimed that any part of her money went to the purchase of the Twentieth and Ferry street property, still the court below should have ordered the property sold and the proceeds apportioned between her and the creditors in the proper proportions.      Hardware Co. v. Horn, 146 Mo. 129.

*Rassieur & Rassieur* for respondents.

(1) No fraud can be perpetrated by any disposition the debtor may see proper to make of his homestead.      Bank of Versailles v. Guthrey, 127 Mo. 189.      (2) Where a business is acquired by a wife with her money, or upon her credit, neither the property, nor the income therefrom, will be subject to the claims of creditors of the husband, even though the husband devoted his time and attention to the management of the business.      Seay v. Hesse. 123 Mo. 450; Siegel v. Quigley, 119 Mo. 76; Mayers v. Kaiser, 85 Wis. 382; Wait on Fraud. Conv., secs. 301, 303, 304.

GANTT, P. J.—This is a suit in equity by a judgment creditor to set aside an alleged fraudulent conveyance to the wife of the judgment debtor of certain real estate in the city of St. Louis, described as Lot No. 31 in City Block 2432, having a front of fifty feet on west line of 20th street by a depth westwardly of one hundred and seventeen feet six inches, bounded on the south by Ferry street and on the east by Twentieth street.

In 1883 Philip Scholz was conducting a planing mill and the debt for which the judgment was rendered grew out of that business.      He failed, and on August 16, 1883, made a voluntary assignment for the benefit of his creditors, reserving his homestead on 11th and Ferry streets which was mortgaged at that time for $4,200.

In November, 1883, Philip Scholz offered to sell the homestead subject to the liens thereon for $800, to his brother

Paul Scholz who resided at Corning, Mo. His brother agreed to take it, as indicated by the following letter:

"Corning, Mo., October 28, 1883.

"Dear Brother Phil.:

"Your offer to sell your house to me received, and while I am not desirous of having property in St. Louis, to help you out I will take it and pay you the $800 you ask. But the deed of trust you write being past due, you got to send to me a written agreement of the insurance company that they will wait another year from time of September 21, 1883, the other $3,000 I will be able to take up when due. Now inclosed find draft and exchange, five pieces, aggregating $800; they are all made to bearer so you will have no trouble collecting them. Of course you will execute me at once a warranty deed of all your claim and only subjected to the two deeds of trust mentioned, $1,200 and $3,000, also pay taxes for 1883 out of the $800 and I will send you that money at once. Hoping that this money will give you a start in some new business, I am, Your Bro., Paul."

The husband gave $500 of this money to his wife for the support of herself and children, and with the remainder thereafter went to Evansville, Ind., to seek employment and he there obtained employment in a planing mill.

Subsequently Paul Scholz voluntarily deeded the property to Mrs. Scholz. His letter to her inclosing the deed is as follows:

"Corning, Mo., December 16, 1883.

"My Dear Sister Belle:

"Since taking the deed in exchange for the money, sent, my conscience has been troubling me some. Think I owe you for many favors you done me in days past, but as it is against my principle to pay old debts I return the deed to you and ask you to accept it as your Christmas gift. Write you only a short letter. My holiday trade is booming, am therefore taking Sunday to write these few lines. My business will

keep me quite busy, so I don't know if I will get a chance to write to Phil. Whenever you write to him remember me to him and kiss my little nephew and nieces. Wishing you all a happy Christmas and a merry and prosperous New Year, I remain, Your Bro., Paul."

"P: S.—Love from Helen."

Mrs. Scholz and her children joined her husband in Evansville, but the mill company, for which Philip was working, failed in 1885, and he returned to St. Louis, seeking employment. Philip Scholz prior to his venture in the planing mill had been a druggist. Soon after his return to St. Louis he met two old friends in the person of Julius Vogt and Justice Nacke, who had known his wife's father, Dr. Carrington, for many years. They suggested to him to return to his old business as an apothecary, but he told them he had no money to invest in a drug store, whereupon they offered to help his family.

They told him that Brockman who had a drug store was desirous of selling and his business could be bought for $1,200. Justice Nacke said to him that he could not go in business for himself but if they could help him or his family, they would indorse for his wife to the amount of $1,000, if Philip would give the business his attention.

Mrs. Scholz was still in Evansville and Philip submitted the proposition to her. At that time the title to the homestead subject to the mortgages was in her, and she still owned a piece of real estate in Philadelphia. In answer to his letter Mrs. Scholz wrote her husband she hated to give her note, she didn't want to hazard her property, but she finally acquiesced, and sent her husband $200 in cash and executed her note for $1,000, which Nacke, Vogt and Wellhauser and her husband indorsed, and with the funds thus raised the drug store was purchased for her by her husband. Nacke insisted that if they did that for his wife, defendant Scholz should manage the drug store for her, and he did so for two years.

The business paid for itself in about 18 months and then Philip Scholz conceived the idea of studying medicine and thereupon W. H. Koetler was employed as her pharmacist and her husband began to attend the medical lectures, his wife furnishing him money to pay his fees and he graduated two years later, and she furnished his office and gave him instruments and fixtures to the amount of eight hundred dollars. In the meantime the homestead property was leased by Mrs. Scholz and later on, in 1886, she sold her Philadelphia property for $2,400. With this sum and her rentals and receipts from her store she built another building on the homestead property at a cost of $3,200, and paid off the mortgages thereon. The new building yielded a rental of $36 per month and her family resided in the old homestead building. After defendant Philip Scholz began the practice of medicine he was enabled to support his family, thus leaving the drug business free of that burden and it seems to have been very lucrative.

He testified that he gave his wife $1,600 for the support of the family from March, 1889, to March, 1890, and from March, 1890, to March, 1894, from $1,500 to $2,000 annually, and repaid her the $800 which she had loaned him to buy his fixtures and instruments.

In 1892 Mrs. Scholz bought the property at Ferry and 20th streets for $3,400, paying cash for it.

The foregoing statement forms the basis of the discussion of counsel in their briefs and arguments.

On the part of plaintiff it is earnestly insisted that it discloses a scheme and a device by defendant Philip Scholz, with the consent and assistance of his wife, to make a permanent provision for his own use and to hold it free from his creditors, and that therefore the drug store and all the other property acquired therefrom should be subjected to the claim of his creditors. Whereas the defendant Mrs. Scholz

insists that the drug store was purchased with her own money and with the proceeds of her own note which she was enabled to make because old friends of her father were desirous of aiding her, and that the evidence is clear that they would not indorse for her husband but stated they only did it for her to enable her to take care of her family.

The circuit court found for the wife and we think the evidence sustains its decree. While courts are astute to discover fraudulent schemes to defraud creditors and will scrutinize very closely all transactions between husband and wife when it is charged the husband is covering his property in his wife's name, they have not yet put up an embargo upon the wives of unfortunate debtors which will prevent them from securing homes for themselves and their families when the husband has failed.

If the evidence in this case is viewed entirely from the plaintiff's standpoint and the statements discredited because coming through interested channels, it may be conceded that the circuit court could have found that the arrangement was made for the benefit of the husband, Philip Scholz. But on the other hand if we regard the testimony as credible, and consonant with our experience, it is not strange that the court found that the property belonged to Mrs. Scholz. Beginning with the failure of Philip Scholz in the planing mill, it appears that he reserved what the law permitted, his homestead which was burdened with two mortgages, to the amount of $4,200. He valued the equity left therein at $800 and accordingly we find that several months after his voluntary assignment and at a time when his creditors had no claim against the homestead he sold it to his brother for $800. No fraud could have been perpetrated by this sale. There was no motive for fraud. [Bank of Versailles v. Guthrey, 127 Mo. 189.]

Nor do we think there was under the circumstances and relationship anything remarkable or suspicious in the fact

that Paul Scholz, who had been the beneficiary of Philip Scholz's family, voluntarily reconveyed to his brother's wife the little equity in the homestead. Our anxiety to uncover fraud must not lead us to deny that men still have natural affections and that gratitude no longer exists. The letter bears internal evidence of having been prompted by a most natural affection and was highly creditable to Paul Scholz. Surely no taint of fraud can be found in his conduct. He had bought that which his brother had a perfect legal right to sell and neither law or the most rigid ethics can condemn his action. The lot of an insolvent debtor's family will be hard indeed when it shall come to pass that not even a brother can aid them, and that brother, as in this case, one who had received many favors at their hands when they were able to bestow them.

We think then that by Paul's deed to Mrs. Scholz the title to the homestead was vested in her subject to the mortgages on it.

At that time she still owned her property in Philadelphia, afterwards sold for $2,400. When then Vogt and Nacke as friends of her father, Dr. Carrington, proposed to help her by indorsing for her, to enable her to buy the drug store, it must be borne in mind that she was the owner of all the property left to the family and she hesitated and said she didn't want to sign the note. Whether her signature would bind her in law it matters not, for this discussion. She thought it would, and did not want to hazard the little she had left.

We think the evidence fairly shows when viewed from a judicial standpoint that Vogt and Nacke proposed the arrangement for the benefit of Mrs. Scholz and that they became her sureties, not merely from the form of the note they executed in which she alone was the maker and all the other signers indorsers, but from their expressed intentions at the time. Receiving the rents on her homestead during

the time she resided in Evansville we think it not at all unreasonable that she had the $200 cash which the evidence shows she·sent her husband to pay down on the purchase of the drug store. That Vogt, Nacke and Wellhausen could lend their names to Mrs. Scholz if they chose, there certainly can be no doubt and thus the title to the drug business also accrued to Mrs. Scholz.

Did the fact that Nacke required as a safeguard that Philip, her husband, should act as her manager of the drug business render the transaction void? This is really the most suspicious circumstance in the whole transaction. It is the one which the learned counsel for plaintiff urges with most force. They insist that this shows that the whole scheme was but a clever device to place the property in the wife for the use of the husband and secure it from his creditors.

They invoke the presumption that property obtained by the wife during her coverture was paid for with the means of the husband. [Patton v. Bragg; 113 Mo. 595; Crook v. Tull, 111 Mo. 283; Sloan v. Torry, 78 Mo. 625.] This is the ordinary presumption, but we think we have shown this presumption was fully rebutted; that the wife was the owner of the property and not the husband, for when the transaction consists as well with honesty as with fraud, it will be presumed honest. [Dallam v. Renshaw, 26 Mo. 533.]

If then, as we hold it was, the property was hers, could she employ or accept her husband's services in running a business, to which he had been trained, and could he lawfully give her his services to aid her in supporting her family?

It would seem that in this jurisdiction the question is settled that he could.

In Wait on Fraudulent Conveyances and Creditors' Bills (3 Ed.), section 303, it is said: "It is settled beyond controversy that a husband may manage the separate property of his wife without necessarily subjecting it, or the profits arising from his management, to the claims of his creditors.

The wife, being vested with the right to hold and acquire property free from the control of her husband, the legitimate inference seems to result that she can employ whomsoever she desires as an agent to manage it. To deny her the right to select her husband for that purpose would constitute a very inequitable limitation upon her right of ownership, compelling her to resort to strangers for advice and assistance, and would perhaps seriously mar the harmony of the marriage relation. In Tresch v. Wirtz, 34 N. J. Eq. 129, the vice-chancellor said: 'A man's creditors can not compel him to work for them. A debtor is not the slave of his creditors. The marital relation does not disqualify a husband from becoming the agent of his wife. All the property of a married woman is now her separate estate; she holds it as a *femme sole*, and has a right to embark it in business. She may lawfully engage in any kind of trade or barter. If she engages in business, and actually furnishes the capital, so that the business is in fact and truth hers, she has a right to ask the aid of her husband, and he may give her his labor and skill without rendering her property liable to seizure for his debts.' "

In the same work, section 304, the following language is used: "And where the wife was the owner of a farm upon which she resided, and which the husband carried on in her name, without any agreement as to compensation, it was held that neither the products of the farm, nor property taken in exchange therefor, could be attached by creditors of the husband." [Gage v. Dauchy, 34 N. Y. 293.]

In Seay v. Hesse, 123 Mo. loc. cit. 457, this court said: "In Webster v. Hildreth, 33 Vt. 457, it is said: 'Equity has no jurisdiction . . . . . . . to compel men to work for their creditors who may perversely prefer to work for their wives and children and leave honest debts unpaid.'

"As was said in the case of Feller v. Alden, 23 Wis. 301: 'For if the farm were really the separate estate of the wife, as

we have already said, the statute expressly declares that she may hold and enjoy it, with the rents and profits, in the same manner and with the like effect as though she were unmarried. It would seem to follow from this, that she might cultivate the farm and manage the personal property by means of any agency which any other owner of such property might employ, and the produce thereof, with the increase of stock, would belong to her.' In the case of Gage v. Dauchy, 34 N. Y. 293, the court says: 'While the legislature leaves the husband the right and makes it his duty to live with his wife, he must necessarily live upon her farm, if they have no other place to live. Surely it could not have been the object of the legislature to deprive the wife of the benefit of his services. The idea that there should be an agreement between them as to wages is absurd; for the legislature has not yet changed the common law so as to allow them to make a business contract with each other. Certainly there is no way provided to enforce it. But, even upon the grounds of equity, there is no reason why the husband should be entitled to the growing crops which he helps to cultivate on her farm. The law still requires him to support his wife and family. If it was competent for the husband and wife to make an agreement in respect to his labor, they might agree that he should bring the amount of his wages into the house to be expended in providing them with food and clothing. As he is, by law, bound to provide for his wife and family, the whole support of the family might be cast upon him, while she used the rents, issues and profits of her separate estate to enlarge her wardrobe, or to engage in some new business which the law allows her to carry on, on her sole and separate account, without interference of her husband. ....... George Hesse had the right to give his personal services and skill to the management of his wife's property, without any other compensation than the support and maintenance of himself and family.' "

Nor is there anything in McLaran v. Mead, 48 Mo. 115, which militates against this view. In that case Judge BLISS for the court said: "If the purchase money was raised upon a pledge of the wife's property, if the credit was given to her on the faith of such pledge, and not to her husband, and if she designed to purchase for herself with her own means, and with no fraudulent intent, the fact that the husband signed the notes and has a marital interest in her property, does not create such resulting trust" (in the husband).

Such we think was the fact under all the evidence in this case, and therefore we do not think that the fact that Nacke required Philip, the husband, to become an indorser with the others, destroyed the force of the other proof that the drug business was bought by and for Mrs. Scholz. After the first two years the drug business was run by Ketter for Mrs. Scholz. That it was profitable and enabled her to buy the property in question we do not think changes the ownership of the property.

There was nothing showing that such a business properly managed is not lucrative. The general impression, whether correct or not, is that few enterprises yield a larger percentage. When we consider that her husband was enabled to support his family after he became a physician and thus left all the earnings of the store and the rentals of her property free for investment, we see no reason for doubting that she had means of her own to invest in the property.

The trial court was more conversant with the situation than we are, had the opportunity of testing the credibility of the witnesses and found there was no fraud in the acquisition of the property by Mrs. Scholz and we think its decree can and ought to be sustained.

The judgment is accordingly affirmed.

*Sherwood* and *Burgess, JJ.,* concur.