SARAH E. COLE v. CHARLES E. COLE and
ALPHA COLE, Appellants.

Division One, November 30, 1910.

1. **FRAUDULENT CONVEYANCE:    To Hinder Creditors.    A**
conveyance by a husband, in business and embarrassed, of his
lands to his wife, made to hinder and delay his creditors, by
which he is rendered insolvent, is fraudulent as to all such
creditors, unless she is at the time a bona fide creditor.

2. ———: ———: **Preferring Wife.** A wife may freely con-
tract with her husband, and if his debt to her is bona fide, he
may prefer her above all other creditors, and secure her to the
exclusion of all of them, existent or subsequent, notwithstanding
she may know of his indebtedness, may know that the convey-
ance will render him insolvent, and may know that it will
hinder them and that its intention is to hinder and delay them.
But she must not become a party to his fraudulent intent by
participating in it, for then the conveyance to her will be set
aside.

3. ———: **Discovery of Fraud:    Between Husband and Wife.**
The marital relation affords a convenient cover for fraudulent
property transactions between husband and wife; and there-
fore, where a conveyance by him to her is charged to be fraudu-
lent as to his other creditors, and is claimed by the pair to have
been made in payment of a valid debt due her from him, the
courts will closely eye such transactions to see they do not hide
and consummate fraud, but not so closely as to brand with con-
demnation the duty of a husband to be just to his wife, or to
dam up a natural and proper flow of marital affection.

4. ———: ———: **Facts to Prove Fraud and Bona Fide Debt.**
The wife and husband both testified that the deed by both to
his brother and by the brother to her was made in payment
of her money he had used in his business and otherwise. He
was then insolvent, and neither could remember the amount,
date or particular use to which was put the money he receiv-
ed from her. *Held,* that the fact that no note, memorandum,
check, book or bank account was produced in evidence; that
both admitted to the brother and others that the purpose of
making the conveyance was to defeat or delay his other credi-
tors; that the deed to the brother was promptly recorded, but
the deed from the brother to her was not, but kept in a drawer
for two years in their residence and then disappeared; that she

borrowed money on the property, after the conveyance, to pay some of his judgment creditors, and part of the loan went into his pocket, thereby in effect admitting she was seized to his use; that she made no demand for the deed, did not request payment, and the conveyance was his own spontaneous act; that the value of the property was seemingly in excess of the debt; and that, by subsequent acts of indorsement, she assisted him in what was intended to be a fraud upon subsequent creditors, will all be considered together as establishing her participation in the fraud, and the conveyance will be set aside.

5. ————: **Failure to Record Deed.** Recording a deed from the husband and wife to his brother and failure to record the deed from the brother to her, both made to defraud his other creditors, while not controlling evidence of her participation in the fraud, are not without significance, when the husband was insolvent and the purpose of the conveyance was to delay or defeat his other creditors.

6. ————: **Intent for Future.** Where an element of purpose in a fraudulent scheme is to continue the insolvent debtor in business, a conveyance contracted to screen property from both existing and subsequent creditors is void. And evidence to show an intent to hinder and delay subsequent creditors, is competent to show actual fraud to existing creditors was intended by the conveyance.

7. ————: **Subsequent Creditors.** Actual fraud, or fraud in fact, must be proved in order to authorize the setting aside of a prior voluntary conveyance at the suit of subsequent creditors. But hard-and-fast rules of what constitutes fraud cannot be inflexibly fixed, and, therefore, the circumstances attending the conveyance which point to actual fraud are to be considered; and if they show the grantee participated in the grantor's fraudulent purpose, the conveyance will be set aside as to subsequent creditors.

Appeal from St. Francois Circuit Court.—*Hon. Chas. A. Killian*, Judge.

Reversed and remanded *(with directions).*

*Edward A. Rozier* for appellants.

(1) The petition, as shown by the answer and by the proof adduced by the plaintiff, showed that there was a defect of the parties in interest, and until all parties in interest were brought into court no judgment could be rendered. R. S. 1899, secs. 543, 544 and 650.

(2) No disclaimer having been filed by Addie F. Cole and Robert J. Cole, who obtained an interest in said premises by the very same deed under which plaintiff asserts her interest, they were necessary parties. Garrison v. Frasier, 165 Mo. 40. (3) A conveyance made for the express purpose of putting all the property of the grantor beyond the reach of creditors and thus avoiding the payment of debts, the grantee participating in such purpose, renders the conveyance void against existing and subsequent creditors. Snyder v. Free, 114 Mo. 360; Bracken v. Milner, 99 Mo. App. 191; Johnson v. Murphy, 180 Mo. 612; Payne v. Stanton, 59 Mo. 160; Boatmen's Bank v. Overall, 90 Mo. 410; Boatmen's Bank v. Overall, 16 Mo. App. 510; Landers v. Ziehr, 150 Mo. 403; Bank v. Simpson, 152 Mo. 638; Mutual Life Ins. Co. v. Sandfeller, 9 Mo. App. 289; Pawley v. Vogel, 42 Mo. 303; Kinealy v. Macklin, 89 Mo. 441; Hoffman v. Nolte, 127 Mo. 120; Fisher v. Lewis, 69 Mo. 632; Frank v. Caruthers, 108 Mo. 574; Lackland v. Smith, 5 Mo. App. 164. (4) The evidence showing that Sarah E. Cole was a knowing party to the conveyance to tie up or hide the property of her husband, the very disjointed evidence of payment of past indebtedness should be disregarded. Hoffman v. Nolte, 127 Mo. 120; Balz v. Nelson, 171 Mo. 682. (5) The evidence demonstrates that Sarah E. Cole was a party to the fraud, hence this court cannot consider any debts due from the husband to the wife. Jones v. Hogan, 135 Mo. App. 347; Balz v. Nelson, 171 Mo. 682; Bank v. Winn, 132 Mo. 87; Riley v. Vaughn, 116 Mo. 176; Sexton v. Anderson, 95 Mo. 379; Farwell v. Meyer, 67 Mo. App. 566; Gruner v. Scholz, 154 Mo. 415. (6) The grantee can acquire no title where such grantee participates with the grantor in the design to cover up the property of the grantor. Shelly v. Booth, 73 Mo. 77; Ryan v. Young, 79 Mo. 30; Balz v. Nelson, 171 Mo. 682. (7) The grantor having no other property, and being then insolvent, a

voluntary conveyance by him is fraudulent. Scharff v. McGaugh, 205 Mo. 364; Benne v. Schnecko, 100 Mo. 256. (8) The conveyances in this case being voluntary and for the express purpose of putting property out of the reach of creditors, both existing and subsequent, and being participated in by the grantee, must be held null and void. Snyder v. Free, 114 Mo. 360; Pawley v. Vogel, 42 Mo. 303; Payne 'v. Stanton, 59 Mo. 160; Bracken v. Milner, 99 Mo. App. 191; Loehr v. Murphy, 45 Mo. App. 524. (9) The facts in this case show fraud in fact participated in by both grantors and grantees, and hence do not come under the rule laid down in the cases of which the following are the leading ones: Bayha v. Kessler, 79 Mo. 555; Krueger v. Vorhauer, 164 Mo. 156. (10) A voluntary conveyance by a husband to his wife will be closely scrutinized when the same comes in conflict with creditors. Holloway v. Holloway, 103 Mo. 282; Scharff v. McGough, 205 Mo. 344.

*Pipkin & Swink* for respondent.

There was no defect of parties in interest. Huff v. Land & Imp. Co., 157 Mo. 65; Garrison v. Fraser, 165 Mo. 40. The doctrine is well settled that a voluntary conveyance by a person in debt is not, as to subsequent creditors, fraudulent *per se*. Payne v. Stanton, 59 Mo. 159; Frank v. Caruthers, 108 Mo. 569; Snyder v. Free, 114 Mo. 360; Lander v. Zieln, 150 Mo. 413; Krueger v. Vorhauer, 164 Mo. 156. The evidence shows that S. I. Cole, at the time of execution of the first deed, did not contemplate engaging in any other business or vocation, hazardous or otherwise. The weight of the evidence shows that Sarah E. Cole did not enter into collusion with her husband to defraud his creditors, but that said deed was made to recompense her for money advanced to her husband. The trial judge found, as a matter of fact, there was no intent to defraud the execution creditor.

LAMM, P. J.—Alpha is the sister and Sarah the wife of Samuel I. Cole. Charles is his brother. Averring she has title as owner in fee of an undivided one-sixth of the south half of the northeast quarter, the southeast quarter of the northwest quarter, the east half of the southwest quarter, the west half of the southeast quarter—all in section 16—and the north half of the north half of the northwest quarter of section 21, all in township 37, range 4, containing 320 acres, in St. Francois county, Sarah sues Alpha and Charles to quiet title under section 650, Revised Statutes 1899 (now sec. 2535, R. S. 1909, as amended), alleging that the remaining undivided five-sixth interest is not in dispute, that she has no interest therein, that defendants claim adversely to her said estate in said undivided one-sixth, she prays the court to ascertain and determine her title and that of defendants respectively therein.

Alpha answers separately. Her defense is a misjoinder of the parties defendant in that Robert I. and Addie F. Cole are necessary parties as owners of an undivided fee-simple interest in the real estate—they being in joint possession and enjoying rents and income with Alpha and her codefendant, Charles; that no judgment can be entered determining the interest of plaintiff that will not affect theirs in each and every undivided portion thereof; that Robert and Addie acquired their interest by a deed, dated May 12, 1897, recorded in a certain named book and page of the land records of St. Francois.

Her further answer, by way of affirmative matter and second defense, is that plaintiff claims under a conveyance from defendant, Charles; that such conveyance was a covinous contrivance, a part of a fraudulent scheme concocted by plaintiff and her husband, intended to hinder, delay and defraud his existing and subsequent creditors; that he was insolvent on the 10th of January 1895, prior thereto and ever since that time,

owing sundry specified debts, and owning no other property, except his then interest in the said land, descended to him by inheritance from his deceased mother, Mary; that, being such owner and so indebted, he conspired and confederated with his wife with the intent aforesaid; that in pursuance and furtherance of such conspiracy, they persuaded Charles to join therein, as the conduit through which the husband's said title should pass to plaintiff, thereby putting it out of the reach of present or subsequent creditors on legal process to collect debts then existing or thereafter contracted; that on the 10th of January, 1895, in view of the scheme so concocted, Samuel and plaintiff, without consideration and fraudulently, conveyed to Charles, with the understanding then had that he would hold the property for the benefit of Samuel, and at some convenient future season, in pursuance of the fraud so contrived, would convey to plaintiff. Charles was persuaded, by the solicitations and entreaties of grantors in said deed, to accept such conveyance to him for the fraudulent purpose named, and afterwards he, to further consummate such purpose, purchased the entire title to the land at the sheriff's sale, made in partition between the heirs of said Mary Cole, and presently executed and delivered a deed of date of May 12, 1897, purporting to convey to plaintiff an undivided one-sixth, which deed was voluntary, without consideration, fraudulent, and made for the sole purpose of furthering the fraud by placing Samuel's title in his wife, with the intent thereby to hinder, delay and defraud his existing and subsequent creditors; that plaintiff was fully cognizant of the fraud as a party to the conspiracy, well knowing that her husband was insolvent and owned no other property; and that afterwards defendant, Alpha, became the owner of Samuel's said interest through a sheriff's deed under an execution levied thereon, which deed was executed on August 11, 1903,

and put of record.  Wherefore, she prays said several fraudulent conveyances be declared void and of no account, and that Samuel's title be determined to have passed to her through her sheriff's deed.

For a third defense Alpha pleads substantially the same facts elaborated in her second defense and avers the deeds from Samuel and plaintiff to Charles, and from Charles to Plaintiff, purporting to convey Samuel's interest, were fraudulent contrivances intended to hinder and delay present and subsequent creditors, and were executed and spread of record to that end, are a cloud upon the title and interest of Alpha, so acquired through her sheriff's deed, and should be cancelled and annulled to remove it.  For such, and all other meet and proper relief, she prays, averring that Sarah has no title or interest whatever.

The separate answer of Charles pleads the same misjoinder of parties defendant and in interest  set up in Alpha's answer, denies plaintiff has any legal or equitable right in the land and asserts that the disputed interest is the property of his codefendant, Alpha.

A conventional reply was filed

The case made is this:  Plaintiff, given the opening and close over objection made and exception saved, introduced a warranty deed, dated May 12, 1897, from Charles E. Cole and wife to Alpha, Sarah E. (wife of Samuel), Robert I. and Addie F. Cole, consideration $1500, conveying to them an undivided two-thirds interest in the land described in the petition, share and share alike, subject to a deed of trust, dated four days prior, securing $1925 to one McCormack, and rested.

Thereupon defendants asked an instruction, viz., that a defect of parties defendant appearing, the case must abate until they (Robert I. and Addie F. Cole) are brought in.  On its refusal, defendants introduced deeds, judgments and oral testimony to establish the issues on their behalf as follows:

A sheriff's deed, date August 11, 1903, conveying to Alpha Cole all the right, title, interest and estate of Samuel I. Cole in the land described. It narrates, *inter alia*, that on September 18, 1901, a transcript judgment was filed in the circuit court of St. Francois in favor of the St. Francois County Bank against Samuel and others for the sum of $184.53 and $21.52 damages, upon which execution was issued from the office of the clerk of said court, dated July 15, 1903, levied the same day upon Samuel's interest and right in the land. After due advertisement his right and interest was knocked down to Alpha Cole on her bid of $206.05, a sheriff's deed following, acknowledged and spread of record on the same day.

A warranty deed, in form, dated January 2, 1895, from Samuel I. Cole and Sarah, his wife, to Charles E. Cole, consideration $1000, conveying an undivided one-ninth interest in the land described, acknowledged on the 10th of that month and spread of record.

It appears sufficiently from admissions and from oral testimony that Mary J. Cole, the mother of Samuel, Charles and Alpha Cole, was the common source of title, dying intestate, seized of the land and left nine children, each inheriting an undivided one-ninth.

Defendants next put in the judgment and files in a partition proceeding between the heirs of Mary J. Cole, in the St. Francois Circuit Court in 1906. Plaintiff was not a party to that proceeding, but Samuel, her husband, was. The partition decree found and adjudged that Charles had acquired by purchase the interest of Samuel and a sister, Mrs. Boggs, and that, in his own right and as such purchaser, he was the owner of an undivided one-third, and the remaining children of an undivided one-ninth each; that the land was not susceptible of partition; that an order of sale be made, etc. In pursuance of a sale made under such order, on

May 11, 1897, Charles purchased the land on his bid of $4000 and received a deed in due form.

They next introduced a trust deed on the land from Charles E. Cole, Sarah E. Cole and others to the Missouri Trust Co., securing $3500, put of record, date, September 18, 1899.

Next, a transcript judgment, dated June 30, 1898, in favor of John O. Long and against Samuel I. Cole for $108.

Barring some notes, evidencing indebtedness of Samuel, the foregoing is all the record and documentary evidence. The Long judgment was put in as part of the proof tending to show indebtedness and insolvency of Samuel.

Supplementing such record evidence, defendants put in oral testimony, viz.:

By Charles E. Cole, that his brother, Samuel, was insolvent on January 10, 1895, and remained insolvent from that day to the date of the trial; that he owed named debts on that date and subsequently which he did not and could not pay. (It will serve no necessary purpose to go into the details of this indebtedness, because there is no dispute about the debts or the insolvency of Samuel at the time of the conveyances in question or afterwards.) Witness was surety for Samuel to the amount of $160. In January, 1895, Samuel was in the livery business in Bonne Terre. He owed John Lyons part of the purchase money. Lyons sold the note to the Farmers' and Miners' Bank. Samuel came to witness and explained that the bank was "pushing" him for the money, that he didn't have it and on that account he wanted witness to accept a deed to his interest in the land and then reconvey to Sarah, his wife. The next day witness and his wife went to the home of Samuel, in Bonne Terre, and there Sarah and Samuel told him that Samuel "was badly in debt and wanted to get the land out of his hands so that the Farmers' and Miners' Bank and John O. Long couldn't

get his land." As a result of the interview it was ar-
ranged they should execute a deed to Charles and
thereupon he should reconvey back to Sarah. So said,
so done. Those deeds were executed on the same day
and as part of the same transaction. (Note: The deed
to Charles was recorded, but the reconveyance to Sarah,
though delivered, was not. It was left with her, kept
in a dresser drawer, disappeared and is unaccounted
for.) No consideration passed for either deed. Sub-
sequently, witness brought a partition suit, making
Samuel and not Sarah a party. Asked to explain why,
his reply was: "Well, she wasn't supposed to have
any interest in the land. The public didn't know she
had any interest." In and about that partition suit and
the sale thereunder, witness had a power of attorney
from the Cole heirs, including Samuel. Witness bid
the land in pursuance of that power of attorney and
afterwards was instructed by Samuel as follows: "You
make the land back to my wife. My debts have not
been paid, you make my interest over to her again."
In pursuance of that instruction witness executed the
deed introduced by plaintiff. No consideration was
paid. Samuel requested the deed to be made, "so
that the bank and Long couldn't get anything against
him; at that time the bank had secured a judgment
against him." Sarah understood witness was convey-
ing to her the interest she had formerly conveyed to
witness. Afterwards when an attempt was made to
get Sarah to sign a deed of trust and "secure some
money to change the deed of trust from the Missouri
Trust Co." "she said she had no interest in it and would
do whatever Irve (her husband) wanted her to. . ...
She made that same statement in the presence of Mr.
Marbury, when Marbury went to take the acknowledg-
ment of the deed of trust." While witness held title
he held it for the benefit of Samuel—"in trust for
him." Witness, surety for Samuel on some of his out-
standing notes, had them to pay. The Farmers' and

Miners' Bank of Bonne Terre brought suit on its note and recovered judgment in the November following the conveyance by plaintiff and her husband to witness.

On cross-examination, witness disclaimed any interest or title to that part of the land in dispute. It belongs to his sister, Alpha. At the time of the conveyance in January, 1895, Alpha was Samuel's creditor. Shortly thereafter, in a day or two, she came down to get her money. Samuel told her he didn't make the deed "to beat her; I only did it to beat the Farmers' and Miners' Bank." Alpha knew that Samuel was insolvent. Samuel at the time of his marriage (in 1894), was in the livery business. He went out of that and into the saloon business. Did not know whether Samuel was doing business on his wife's money. Samuel did not state that the consideration moving in the conveyances to his wife was money he had used of hers. Witness had never seen the (first) deed he made to Sarah since it was delivered. Found out afterwards it was not of record. Samuel told him the reason he didn't want it put on record was, "He didn't want the creditors to know the land was transferred back to his wife." Inquired of when the debt was contracted, afterwards merged into the judgment under which the land was sold to Alpha, witness said he didn't know of the day of the month but it was about two years prior to the time it was sold. (Note: This would make the date of the indebtedness about 1901.) In and about the purchase at the sheriff's sale, witness was the agent of his sister, Alpha, and bid for her. He had examined the records before that to see whether the deeds had been placed on record. In further explaining why Sarah was not made a party to the partition suit, witness said it was because Samuel said the deed was never placed on record, "He put the title in me to hold for him," and he didn't want creditors to know it had been retransferred to his wife.

By Benjamin H. Marbury, the prosecuting attorney of the county, defendants showed that two or three years before the trial (the trial was in 1904) he represented Samuel and Charles Cole in trying to borrow some money on the land in question. They wanted witness to secure a loan to pay a mortgage then on the land (presumably, the McCormack mortgage), and to pay some outstanding debts "against S. I. Cole's property." Witness got an abstract and found a judgment against Samuel. The trust company (presumably, The Missouri Trust Co., afterwards making the loan) refused to loan the money until the indebtedness and judgment were paid. Witness went with Samuel to see his wife and talk with her about it. The substance of the conversation was that Charles Cole had conveyed back Samuel's interest to his wife for the purpose of keeping the property from being sold on account of debts and judgments against Samuel. Afterwards, when the money was borrowed, some of Samuel's debts and judgments were paid out of the loan; for a certain indebtedness Samuel owed Charles, independent of the amount settled, a deed of trust securing him was to be given, in which Sarah was to join. Samuel I. Cole received in cash some of the loan. If we understand it, the negotiation resulted in the mortgage loan made by the Missouri Trust Company, and that Sarah joined in that mortgage. On cross-examination, this witness reiterated his statement that before the loan could be made he talked with the plaintiff and that her consent was obtained that she, with the other Coles, would join in the deed of trust, and before the money would pass certain of Samuel's debts were to be paid. Plaintiff did not want to sign the note on those conditions, but finally did sign it.

Defendant Alpha testified in substance that she knew Samuel was considerably in debt; he owed her and never paid her; her debt was paid afterwards by

Charles, and Samuel never repaid him. She remembered the partition suit of the old homestead and of purchasing the interest of Samuel at execution sale. She directed Charles to bid it in for her and she is in possession now under the sheriff's deed then received. Samuel's financial condition never improved after 1895, he continued in debt. After Samuel made the (first) conveyance to Charles, the next day or the day after, she went to see him, talked with him in the presence of Sarah. Samuel then told her, "He hadn't put the land out of his hands to keep me from getting anything, but to keep the others." He didn't name the others. Sarah was close by; "they were all standing right close together in the kitchen by the table." On cross-examination she said there was nothing said there about Samuel owing his wife and she knew nothing about that. At that time Samuel was in the livery business, afterwards ran a saloon. He stayed in the livery business some two or three years. Witness did not know whether he anticipated going into any other business. He said nothing about that. Samuel did not say there that his object was to beat those from whom he got money afterwards. She knew nothing about her brother using $1000 of his wife's money. In that conversation Samuel said, "He didn't want those people coming from the city to get this. He was owing some money at the city for rigs." He told her he was not trying "to beat her," but he put the "land out of his hands to keep people from taking this land." Witness lived in Washington county. Inquired of about the value of the land, she said she supposed it could be sold for "$35 or $50 an acre, about $55, I guess." It lies about a mile or two from Bonne Terre, perhaps a mile from the shafts of the Bonne Terre mines.

After the immaterial testimony of J. H. Lyons, defendants introduced the record of a judgment in favor of the Farmers' and Miners' Bank against Samuel for $332.50, dated November 19, 1895. (This judgment

seems to be for the purchase money of the livery stable from Lyons in 1894, the note evidencing it having been transferred to said bank, and it is the same note on which payment was being "pushed" when the first deeds were made.)

To sustain the issues on her part, plaintiff took the stand, testifying in substance as follows: She married Samuel Cole in 1894. Was then the widow of Alex Rairden. "Q. Will you state to this court what money, notes, property and effects you brought to the marriage altar? . . . A. Something over, I guess, $1000, I don't remember just exactly." Inquired what became "of that money" she replied: "Cole got away with it, some way, I couldn't state just how." "He got it;" she either "let him have it or he got it some way." Asked what indebtedness or money was owing her from her husband in January, 1895, on the day they made a deed to Charles. and Charles and his wife made a deed to her, she replied, "All he ever got from me he still owes me." Then followed these questions and answers: "Q. How much was that? A. Of course, I don't know how much money, and all my stock, what I had, he had gotten away with some of that. Q. How much did it amount to, about, that he was owing you at that time? A. I don't know just how much. Q. You can't approximate it? A. I don't know how much we had left after that, I don't remember." The deed was made to make good what money and property he got from her, to pay what he owed her. She denied entering into any conspiracy with her husband to defraud his creditors by hindering or delaying them. There was "never a word between us" relating to that. Witness didn't think she knew about his debts at that time. She remembered, however, she was on one or two of his notes. The deed from Charles to her (the one made in 1895) was put in the dresser drawer and when Mr. Cole went away from home she never saw it any more. (Note: Other testimony shows that Samuel

was not living with Sarah at the time of the trial.) She disclaimed knowing anything about the deed made to her by Charles after the partition suit. She didn't remember it. On cross-examination she testified she didn't remember how much her husband was indebted to her in January, 1895; did not know he was largely indebted (to others), she remembered signing a note for her husband to Alpha Cole in 1894. She signed it "to please him, to get her to wait on him." He didn't ask her to pay anything on it and she didn't sign it with the intention of having to pay it. She didn't know whether she was surety on a $250 note in the bank at Bonne Terre; she remembered an old Obert note for $150, she signed that the same as she did the other, viz.; on the theory that he would pay it after awhile and she would not be called on for a cent. He asked her to sign it to keep Obert from pushing him. She remembered of no property that her husband owned but his interest in the homestead. Asked pointedly if she had any conversation with Charles Cole and his wife before they made the deed, her reply was that her *husband* had never said a word about it; that she was in bed sick that day, her husband had proposed to make a deed to his brother and that he would transfer it back to her. Her husband said it wouldn't be lawful for him to make the deed. "He made it to me for what he had spent of mine." The foregoing testimony was given in response to the question, "Now, Mrs. Cole, how did this deed come to be made?" She further testified that she signed notes for her husband after he had spent her money to keep people from pushing him, that her husband never gave her a note or any evidence of indebtedness. She remembered specifically one item of $253.50 that her husband got from her on the street and was to put in the bank in her name, but put it in in his own name. Her husband lived on her property while it lasted. "It was spent about all for himself." She couldn't say whether he was an industrious money

making man. She "supposed he earned a little bit to support the family." "Q. He spent what he got from you for the remainder? A. No, sir. He didn't spend my money for living. Q. How did he live, then? A. He didn't live very much." She reiterated that she had no recollection of getting any other deed from Charles but the first one. She "was claiming it (the land) from that deed, given me to make me good for my money." She had no knowledge of any other deed. She paid Charles nothing in consideration of any deed.

Samuel I. Cole testified in behalf of plaintiff, in substance that he owed his wife in 1895, at the time the deeds were made; that he made the deed to pay the debt; he denied entering into any conspiracy with his wife or Charles to delay, cheat or defraud his creditors; there were no judgments against him at that time. He was then in the livery business at Bonne Terre and owed a joint note to the Farmers' and Miners' Bank for the purchase of the livery stable with his brother-in-law, Bogy, who signed the note as joint maker. This note was afterwards paid by a loan from Dr. McCormack, or the Missouri Trust Co. Charles made the deed of trust and took up the note. At the time of the conveyances in 1895 witness, in reply to a question whether he contemplated engaging in any hazardous undertaking other than the livery business, said, "No, I don't know that I was." Afterwards he borrowed money from the St. Francois County Bank (this was the loan merged into the judgment under which Alpha Cole bought). That loan was made three or four years ago. Witness did not know the date, but his approximation brought it about the year 1900 or 1901. The money was borrowed to go into the restaurant business. In 1895 he had no undertaking like that in view. On cross-examination witness testified that he was not now in any business; had no property producing any income or means of living; was living with his sister, Miss Cole; was paying no board, but was doing work

on the farm, marking off corn ground, which was "pretty hard work if you keep things straight." Inquired of as to his indebtedness of 1895, he testified to various debts, but, as said, his insolvency was admitted, hence the details are of no consequence. He denied making as many debts as he could after the conveyance, but admitted becoming indebted after that time, and remained in debt practically all the time up to the present. He admitted that his wife met him on the street and told him to put $253 in the bank. Witness took the money out of her hands and put in the bank in his own name. That happened some *time in 1895, some time in the summer.* (Note: The deed to Charles and the reconveyance was in January, 1895.) He "reckoned" he supported his family, but had contributed nothing to their support for the last six months and had been unable to pay his debts. He didn't remember whether he told Charles why he was making the 1895 conveyances. But he got Charles to agree to reconvey to his wife. Inquired of about the deed made by Charles after the partition suit, he testified that Sarah's name was put in as one of the grantees by his order. The first deed to Sarah was not put on record because Charles was in some trouble with his wife and he didn't want the deed to go on record. The first deed was made to his wife to secure Sarah for her money he had used, and the last deed was on the same consideration. No money was paid for either deed. Charles didn't object to making the last deed as requested by witness. Witness was a party defendant in the partition suit, and when Charles E. Cole bought the premises in for the heirs, witness directed the property to be put in his wife's name and not to make a deed to him. On re-examination he identified a note made in 1896 by him to the Farmers and Miners Bank for $250, signed by his wife and others as sureties. The last deed to Sarah was made in lieu of the other.

Mr. Young, produced for plaintiff, gave testimony to the effect that he was one of the sureties for Samuel on the note merged in the judgment under which Alpha bought. Witness ordered out the execution. If Samuel Cole had any interest in the land the sureties wanted it sold to save them from paying the judgment. Charles Cole came to town to look up the title. Witness, representing the other sureties, had a talk with him. He told witness that Samuel didn't have any interest in the land; it had been deeded to his wife, first having been deeded to him and then reconveyed to Samuel's wife; and that it should be on record. We went to the record and couldn't find the deed. "Charley said it ought to be there, but we couldn't find it on the land records." Afterwards Charles Cole ran the land up on the sale to the exact amount of the debt and then directed the deed to be made to his sister, Alpha. The levy was made on the theory that Samuel owned one-ninth interest in the land. Witness was instrumental in having the property levied on and sold as Samuel's.

Such was the testimony.

After taking time to consider, the chancellor entered a decree finding that Samuel conveyed an undivided one-ninth interest on January 2, 1895, to defendant, Charles; that afterwards and after the partition sale Charles conveyed a one-sixth interest to Sarah. The decree makes no mention of the unrecorded conveyance made by Charles to the plaintiff, but goes on to find that Charles became the purchaser of *all* the interest in the land at the partition sale and then conveyed Sarah one-sixth; that Charles paid nothing to Samuel for his deed; that at the partition sale Charles paid nothing for Samuel's one-ninth interest; that his conveyance to Sarah thereafter was without consideration and that all these deeds were fraudulent as to Samuel's then existing creditors; that Samuel was then insolvent and remained so; that defendant Alpha purchased the interest of Samuel in 1903 on an execution sale on a

judgment on Samuel's note to the St. Francois County Bank, given during the year 1900, with personal security; that there was no evidence said debt was contracted on the strength of any interest Samuel had in the property; and that the deeds, first above, were not fraudulent as to subsequent debts. On such premises it was decreed that Alpha took no title whatever; and that Sarah was the owner in fee of an undivided one-sixth interest, as against both Alpha and Charles.

It is assigned for error, first, that the decree is inequitable and for the wrong party; second, that the chancellor erred in ruling adversely on the contention that a decree could not go unless other necessary parties were brought in; and third, in giving plaintiff the opening and close at the trial.

Attending to the main point, we conclude the decree was for the wrong party. In arriving at such conclusion certain facts and propositions of law may be assumed as so well established as to be put beyond all question on this record, viz.: That Samuel Cole was in business, was embarrassed, was made insolvent by the conveyances of January, 1895, and May, 1897, and left without ability or disposition to pay his then existing debts; that, as to Samuel and as to all his then creditors (besides his wife), he beggared himself by putting all property subject to legal process out of his hands to hinder and delay them, *ergo* as to them the deeds were fraudulent in fact and law; and that Samuel continued in business, flitting from keeping a livery stable to keeping a tippling-house and then a victualling-house —at all times *independently* broken and insolvent, contracting debts as formerly and not paying them. He seems a litigious and scheming man, lightly assuming and then throwing off the burden of the yoke of pecuniary obligations.

In the foregoing views the case is so narrowed as to be encompassed by these questions: Did Sarah, his wife, participate in his fraudulent intent to hinder and

delay existing creditors? We think so. Did Samuel, by the conveyances in question, have the intent to hinder and delay his subsequent creditors? We think so. Did Sarah, his wife, participate in and loan herself to such fraudulent intent? We think so.

In stating grounds for such affirmative answers we shall assume it good doctrine that, under our married woman's enabling acts, a wife may freely contract with her husband. That, if she be a bona fide creditor, her debt stands on as sure a foot as that of anyone else; he may prefer her since those acts, as before, by securing her debts to the exclusion of others, existing or subsequent, notwithstanding she may have known of his indebtedness and insolvency, notwithstanding she knew that the fact of her preference would have the ultimate effect of hindering and delaying his other creditors, and notwithstanding the husband intended to hinder and delay his creditors—all this, *so long as, and provided always,* she keep her hands clean by not participating in and becoming a party to his fraudulent intent. There is thin ice there and one who walks thereon has need of great care.

Fraud is easy to accomplish and hard to prove. It is a sound proposition that, as the marital relation affords a convenient cover for fraudulent property transactions between husband and wife, courts, where fraud is charged as the gist of the action, will closely eye such transactions (when in conflict with the claims of creditors) to see they do not hide and consummate fraud—being always mindful, withal, that judicial zeal to uncover and smite fraud must not be pushed so far as to dam up a natural and proper flow of marital affection or whittle away the duty of a husband to be just to his wife. To her (as to others) he should live honestly, should hurt nobody and render everyone his due, thereby observing the great commandment of the law.

We think the following further observations pertinent to this record and decisive of the case:

(a). The evidence of the extent, items, date and character of the indebtedness from Samuel Cole to his wife is scant and inconclusive. We set some store on the fact that no note, memorandum or book account, checks or bank account were produced. The principal item of $253 which she gave him on the street to put in the bank to her credit and which he put to his own, was given him in the summer of 1895, long after the first deed from Samuel and Sarah to Charles Cole for Samuel's one-ninth interest in the mother's homestead and Charles' reconveyance to her. When it is sought to sustain a conveyance under such circumstances, a chancellor looks anxiously for corroborative proof, or, failing in that (as here), for those badges of good faith, arising from specification in details, date, amount and other *indicia* earmarking the ordinary run of business transactions, and making the proof fairly certain.

(b). But if it were conceded that such indebtedness is established at the date of the deeds, yet we are confronted with evidence, practically uncontradicted, that Samuel and Sarah admitted to Charles and Alpha Cole and Mr. Marbury, the prosecuting attorney, that the purpose in making the deeds was to wrest Samuel's property away from his creditors. The fact of indebtedness from Samuel to his wife rests alone on their testimony. The force of the latter is largely spent in establishing a debt. They deny the conspiracy in general terms, but they do not deny otherwise than faintly and impliedly the conversations proving it. Moreover, there is evidence not contradicted that plaintiff treated the property as her husband's. She borrowed money on it after the conveyances to pay some of his judgment creditors as well as some at large, and *part of the loan went into his pocket.* This was but shadowing forth and effectuating the original fraudulent purpose. It was tantamount to an admission that she was seized to

his use. The situation, smacking strongly of fraud, vehemently called for full and satisfactory explanation —and explanation we cannot find.

(c). The failure to record the first conveyance from Charles Cole to plaintiff, while not of controlling, is not entirely without some significance. Samuel's explanation of this is vague and we may not grasp it. Sarah makes none. She put the deed in a drawer and left it there until it disappeared. The absence of such record certainly concealed the fact that Samuel had conveyed his property to his wife, and for over two years left the public to understand there had been an out-and-out sale to Charles. The latter sale invited less suspicion than the former would have done and was less liable to attack. Obviously, the absence of the record of her deed furthered the fraud.

(d). Again, some stress is due to the fact that Sarah made no request or demand of her husband for restitution of moneys converted by him or for payment of a debt due from him. The absence of so natural a thing marks the transaction as novel and out of the usual course, thereby challenging attention. Both of them put the conveyances on his sole spontaneous act. A derelict husband, pricked, however tardily, by an awakened conscience, might make restitution to a wife he had wronged without her request or demand. Verily restitution is the beginning of reformation, even as the fear of the Lord is the beginning of wisdom. But there is nothing in this case showing the conscience of this husband was awakened or pricked into action.

(e). Again, when honest conveyances are made to pay debts, there is usually a correspondence in value between the property and the debt—such disproportion as an excessive conveyance is a badge of fraud. In this case, absent satisfactory evidence of value, we must take the scant and uncontradicted evidence we have. That was to the effect that the property was worth $35,

$50 or $55 per acre. On the theory that Sarah acquired a sixth interest by her last conveyance from Charles, then the interest was worth at $35 per acre the rise of $1800; at $50 per acre the rise of $2600; at $55 per acre the rise of $2900—allowing for a mortgage indebtedness. On the other hand there was no attempt to make the debt of Samuel to Sarah so much as a thousand dollars. One thousand dollars covered all her personal property and she did not testify her husband got it all. On the theory that she acquired only a one-ninth interest by the unrecorded deed made in January, 1895, then the disproportion in value would be appreciably less.

(f). In this connection there is another circumstance tending to throw suspicion on Sarah's title. At first, recognizing that Samuel had only a one-ninth interest, that interest was conveyed to Charles. All sides agree that simultaneously it was reconveyed to Sarah and the deed delivered. If Sarah was not party to the partition suit two years later, the judgment was not *res judicata* as to her, her prior acquired title was not affected by that suit. Now, if her first deed was made to pay a debt and she accepted it as such payment (as she claims) and, if, after the partition suit, Charles, who assumed to have purchased the whole interest in the land (ignoring the fact that Sarah was not a party thereto), conveyed to her, on the order of her husband, without any new consideration, a one-sixth interest, he thereby conveyed a one-eighteenth in excess of that covered by the first deed. All sides agree the last deed was made in lieu of the first and on no new consideration. We must conclude, then, that by some unexplained arrangement between the Cole heirs Samuel became entitled to one-eighteenth more than was cast upon him by inheritance from his mother, and that by his order the title thereto was put in his wife. Not only so, but singular as it may seem, Sarah says she knew nothing about such order, or the last convey-

ance. In her testimony she puts her claim alone on the first deed, and notwithstanding that, the chancellor decreed her a one-sixth instead of a one-ninth interest.

(g). There is evidence indicating that the wife expected the husband to continue in business and, presumably, contract debts in accordance with his known bent and the usual course of business. Now and then she seems to have gone his surety after January, 1895, though she says she paid and intended to pay nothing on that account. She knew, then, that he was making debts in his business precisely as he made them before, with this difference, that her husband's property was now screened by the conveyance to her from the hazard of his new enterprises, except in so far as it might be bound through her suretyship. Intent to defraud may be deduced from circumstances tending to prove such intent. In the nature of things, it is not susceptible of direct proof. There is evidence not only showing that her mind cooperated with his in concocting the original fraud to hinder and delay existing creditors, but there is satisfactory inferential evidence showing the fraud was intended as a continuing one against subsequent creditors. What was done certainly had that effect and the natural effect of that act is presumed to have been intended. If, therefore, it was necessary, on top of actual fraud intended to existing creditors, to show an intent to hinder and delay subsequent creditors, the case is not without evidence to sustain the latter.

Section 2881, Revised Statutes 1909 (formerly Sec. 3398, R. S. 1899), so far as pertinent, reads: "Every conveyance . . . of any estate or interest in lands . . . made or contrived with the intent to hinder, delay or defraud creditors of their lawful . . . debts or demands . . . shall be from henceforth deemed and taken, as against said creditors and purchasers, *prior and subsequent,* to be clearly and utterly void.'

That section has been under exposition often. Fraud assumes such protean shapes, is so detested by the law and can be approached from so many angles, that courts refuse to define it, or fix hard-and-fast limits to it. It is not strange, therefore, that they have not always been able to hold a uniform and steady voice in applying the same set of principles to every case. But in expounding the section it has been held sound doctrine that actual (as contra-distinguished from constructive) fraud, participated in by both grantor and grantee, will vitiate a conveyance as to subsequent as well as to existing creditors. The words of the statute so run and the reason of the thing points unerringly to that conclusion. No man should be allowed to build a superstructure of rights on a foundation of actual fraud, for fraud vitiates everything.

Nor can there be any doubt that where an element of the purpose in a fraudulent scheme, as appears to exist here, is to continue in business, a conveyance contrived to screen property from not only existing but subsequent creditors, from debts springing from the hazards and incidents of the new enterprise, is void.

The views expressed, within the doctrines of a line of cases, stand on reason and authority. Thus:

In Pawley v. Vogel, 42 Mo. l. c. 303, the court was dealing with subsequent creditors in a case passing judgment on transactions between husband and wife, referring to the transactions thus: " . . . but as between him and his creditors, prior and subsequent, being attended with badges of fraud, it can be regarded in no other light than as a continuous scheme of fraud upon them."

In a leading case, often cited, Payne v. Stanton, 59 Mo. l. c. 160, we find this pertinent language as to the effect of actual fraud, borrowed from Chancellor KENT: ". . . actual fraud, or fraud in fact, must be proved in order to set aside a prior voluntary conveyance at the suit of subsequent creditors." The case

holds that a voluntary conveyance as to subsequent creditors is not fraudulent *per se,* "but the question whether it is fraudulent or not is to be determined by all the circumstances." In other words, if the circumstances point to actual fraud, such transaction would open to let in subsequent creditors.

In Shelley v. Boothe, 73 Mo. 77, the issue was between two creditors, one preferred and both then existing. It was ruled that where the creditor preferred participated in the wrong intent of the debtor to hinder and delay other creditors, the debtor's fraud became the fraud of both.

In Sexton v. Anderson, 95 Mo. 373, it was held that if a preferred creditor "acts in good faith and takes the money or the property for the *sole* purpose of saving a bona fide debt," the transaction will stand. To overthrow it he must participate in the debtor's fraudulent intent as to other creditors—mere knowledge of it is not sufficient.

In Snyder v. Free, 114 Mo. 360, it was held that the statute, quoted above, makes no distinction between subsequent and prior creditors, and that under it subsequent creditors are as much within its protection as prior creditors, the only difference being in the mode and extent of the proof of the fraudulent intent. So long as any of the class of subsequent creditors can show that the intent to hinder and delay related to them, such class is let in to share the benefits of the statute.

Lander v. Ziehr, 150 Mo. 403, was a case of a subsequent creditor. In addressing itself to the question, "What then are the circumstances which would justify a court in holding a conveyance fraudulent as to subsequent creditors?" it was said: "A design or purpose to hinder, delay or defraud those to whom he is about to become indebted, are some of the marked *indicia* of fraud. In a word, an intent to contract

debts and a design to avoid the payment of such debts by the conveyance.''

But it is excess of labor to continue the discussion. The curious and inquiring, inclined to exhaust the matter, may consult such cases as Frank v. Caruthers, 108 Mo. 569; Gruner v. Scholz, 154 Mo. 415; Balz v. Nelson, 171 Mo. l. c. 691; Krueger v. Vorhauer, 164 Mo. l. c. 163 *et seq.;* Johnson v. Murphy, 180 Mo. l. c. 611 *et seq.*; Welch v. Mann, 193 Mo. 304; Bracken v. Milner, 99 Mo. App. 187; Loehr v. Murphy, 45 Mo. App. 519.

The decree in favor of the plaintiff does not accord with the propositions announced, and the facts found to exist. The conclusion reached determines the case without deciding the other assignments of error. The decree is accordingly reversed and the cause is remanded with directions to enter a decree finding the issues in favor of defendant, Alpha Cole, sustaining her conveyance, decreeing title in her, cancelling the conveyances made to Sarah E. Cole by Charles E. Cole and removing the cloud thereof. All concur.